IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON ANTHONY FRIDLINE                                                         PLAINTIFF

v.                     Civil No. 5:17-cv-05209

LIEUTENANT ROBIN HOLT;                                                       DEFENDANTS
SERGEANT BALTAZAR MARTINEZ;
DEPUTY JAMES BROWNING;
DEPUTY ERIC STERLING; DEPUTY
LARRY MCCONNELL; DEPUTY
HUNTER VOLNER; DEPUTY SCOTT
DORSEY; DEPUTY KENNETH COGDILL;
and SERGEANT JOE ADAMS

**MEMORANDUM OPINION AND ORDER**

This is a civil rights action brought by Jason Fridline contending that his constitutional rights were violated while he was incarcerated in the Benton County Detention Center (BCDC). Plaintiff proceeds *pro se* and *in forma pauperis*. Plaintiff maintains that his constitutional rights were violated in the following ways: (1) Defendants failed to protect him from a substantial risk of harm; and (2) he was denied access to law library materials.

The case is before the Court on the Motion for Summary Judgment (ECF Nos. 21-23) filed by Defendants. Plaintiff has filed a Response (ECF No. 26).

### I. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

1

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. BACKGROUND

Plaintiff was booked into the BCDC on August 20, 2017, on pending criminal charges. (ECF No. 23-2 at 1).[1] At a health intake screening on August 30th, Plaintiff indicated he had been diagnosed with paranoid schizophrenia and attention deficit hyperactivity disorder (ADHD). (ECF No. 23-4 at 1). Plaintiff indicated that people view him as a violent person and that he had been arrested for a violent crime. (*Id*).

Detainees at the BCDC are provided access to an electronic kiosk and must put all general requests, non-emergency medical requests, and all grievances on the kiosk. (ECF No. 23-1 at 3).

---

[1] All citations will be to the ECF document number and page.

"This informs staff of any purported issue so that it may be addressed or investigated as needed." (*Id*).

### III. DISCUSSION

Section 1983 does not create substantive rights. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). Instead, it provides remedies for deprivations of rights established by the Constitution or the laws of the United States. *Id.* Two elements are required to establish a claim under § 1983. These elements are: (1) the deprivation of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was committed "under color" of state law. *Lugar v. Edmondson*, 457 U.S. 922, 931 (1982).

#### A. Failure to Provide a Safe Environment/Failure to Protect

**(1). Relevant Facts**

Plaintiff submitted the following grievances about his safety:

- 9/6/2017—I am having a problem with a group of inmates. I feel like my safety is in jeopardy. I have told several deputies that I am not safe for a week now and they have not done anything. The problem with inmates is getting worse. **Response by Lieutenant Holt**: "Talk to a pod deputy."

- 9/7/2017—I talked to two pod deputies yesterday to get moved. Nothing happened. I am still having problems with the same inmates. **Response by Lieutenant Holt:** "If you have a valid reason, you will be moved. If you are in fear of your safety, put a request into PC/AdSeg requests.

- 10/1/2017—I have been here since August 19, 2017, housed in D-109. From the beginning I told pod deputies that I was having trouble with inmates and am scared for my safety and security. I asked to be moved to a different pod. I have told pod deputies, sergeants, and Lieutenant Holt. I have talked to Deputy Sterling, Deputy McConnell, Deputy Browning, Deputy Volner, Deputy Dorsey, Deputy Coltren, Deputy Cogdill, Sergeant Martinez, and Lieutenant Holt that I fear for my safety and security. **Response by Lieutenant Holt:** Changed topic from grievance to Protective Custody/Administrative Segregation.

- 10/2/2017—On 9/6/2017, I asked for help because I was scared for my safety in D-109. Lieutenant Holt replied that I needed to talk to the pod deputy. I talked to many pod deputies. I submitted another grievance stating that I had talked to many

> pod deputies and they still did not move me. I said that I was still scared for my safety and need to be moved. I have still not been moved. I have been left in harm's way. On September 10, 2017, I was pulled out by Sergeant Martinez to talk about another incident. I have already talked to Deputy Sterling, Deputy Browning, and Deputy McConnell about the inmate I am having trouble and that I was scared for my safety. I told Sergeant Martinez I was scared for my safety and Deputy Cogdill was there listening as well. **No Response.**

(ECF No. 23-3 at 1-3).

Plaintiff testified that he believed some of the trouble he was having stemmed from an incident that occurred prior to his incarceration. (ECF No. 23-9 at 19). In January of 2017, Ronnie[2] Goff's brother, Shane, who was a passenger in Plaintiff's truck, took off in the truck when Plaintiff had stopped at a gas station. (*Id*. at 19-21). The truck was gone for about a week and a half and the Plaintiff ended up filing a police report. (*Id.* at 20). The day after Plaintiff filed a police report, the truck was returned but his personal belongings, including his tools and items belonging to his children were missing. (*Id*. at 20-23). Plaintiff dismissed the charges. (*Id.* at 20). While the truck was missing, Plaintiff approached some of the Goff brothers' friends to get information on the stolen truck. (*Id.* at 24). This was the extent of Plaintiff's conflict with the Goff brothers. (*Id.* at 23).

In February 2017, Plaintiff was incarcerated with Ronnie and Shane Goff. (ECF No. 23-9 at 29). Shane Goff was moved out of the pod Plaintiff was in to avoid any conflicts between the two. (*Id*). Plaintiff testified they would have "probably had to fight" because of the stolen truck. (*Id*). Ronnie Goff remained in the same pod for a couple of days. (*Id.* at 30). Plaintiff testified they avoided each other. (*Id*).

Plaintiff next saw Shane Goff at one of Plaintiff's court appearances. (ECF No. 23-9 at 28). Shane Goff leaned over and asked the Plaintiff if he wanted to fight. (*Id.* at 28). Plaintiff did

---

[2] In his deposition, Plaintiff referred to this individual as Ryan, Ronnie, and Rodney. To be consistent, the Court will refer to this individual as Ronnie Goff as that is the name used by Plaintiff most frequently.

not respond, and Shane Goff did not say or do anything else. (*Id*). This occurred prior to Plaintiff's August incarceration. (*Id.* at 27-28)

By the time Plaintiff was incarcerated at the BCDC in August 2017, Shane Goff had been transferred to prison. (ECF No. 23-9 at 31). Ronnie Goff remained at the BCDC. (*Id*).

Plaintiff testified that starting on August 25th, he began asking the deputies to be moved. (ECF No. 23-9 at 32). Plaintiff indicated he was scared for his safety and security because he "had problems with inmates in there." (*Id*. at 33). Between August 25th and September 10th, Plaintiff testified that he talked with every one of the deputies he named as Defendants, but he does not recall the specific date when he spoke with each Defendant. (*Id*).

However, Plaintiff recalled that he spoke with Deputy Browning on September 6th. (*Id.* at 52-53). Deputy Browning knew Shane Goff had taken Plaintiff's truck. (*Id*). According to Plaintiff, Deputy Browning was explaining to Deputy Gully that Plaintiff was having problems with Ronnie Goff because of the truck incident. (*Id.* at 53). At no point did Plaintiff identify a specific person or persons that he felt threatened by. (*Id.* at 53-54).

On September 10th, Plaintiff spoke with Sergeant Martinez, and Deputies Sterling, McConnell, Browning and Cogdill were present. (ECF No. 23-9. at 34). Plaintiff testified that prior to September 10th, he had spoken with Deputies Sterling, Browning, McConnell, Dorsey, and Volner about getting moved out of the pod. (*Id*). Plaintiff, who is Caucasian, testified he told the deputies that he was having trouble with some of the "NAE cats." (*Id*); (ECF No. 23-2 at 1). According to Plaintiff, this term refers to a "white supremacist or white separatist group." (ECF No. 23-9 at 34). He did not mention any names until he talked to Deputy Browning. (*Id.* at 34-35).

Plaintiff testified he was being shunned a little bit and you could feel the tension. (ECF No. 23-9 at 35). One thing other inmates would do is keep repeating his name in a low voice and when he asked what they wanted, they would not respond back. (*Id*). The inmates were also "kind of being threatening toward me." (*Id.* at 36). Plaintiff testified the inmates referred to him in disrespectful or derogatory terms, used profanity towards him, and belittled him by, for example, telling him he was making stupid moves while playing cards and was retarded. (*Id*. at 36-37 & 72). No one said they were going to injure him. (*Id*. at 37-38). Plaintiff, however, felt that the taunting was getting more aggressive. (*Id.* at 38). It was the Plaintiff's belief that his troubles in the cell block occurred because he did not fight when he was first put in the block. (*Id.* at 44). According to Plaintiff, he gave the impression of being "weak." (*Id*).

Plaintiff testified it seemed almost as if the inmates were acting threatening towards him in response to something Shane Goff had told them to do. (ECF No. 23-9 at 39). Plaintiff testified Ronnie Goff had friends in the pod that Plaintiff was in. (*Id*). One such friend was Dalton Thompson. (*Id*). Plaintiff testified that Thompson would be aggressive towards him by standing there all "bowed up"[3] and insulting him. (*Id.* at 40). Thompson would insult Plaintiff's intelligence and just generally "hate on" the Plaintiff. (*Id*). Plaintiff believed the problems he had in the pod were all related to his problems with the Goff brothers. (*Id.* at 44-45). Plaintiff felt it was fair to say that Ronnie Goff was not a nice person. (*Id.* at 45).

Plaintiff testified he was in the pod for nearly a month before an altercation occurred. (ECF No. 23-9 at 41). He managed this by "bowing down." (*Id*). Plaintiff testified that "somebody keeps mouthing you and mouthing you until you do something about it." (*Id*). Plaintiff testified

---

[3] The term is "Southern Slang for body language interpreted as puffing up as if preparing to fight someone." https://www.urbandictionary.com/define.php?term=Bow%20Up (accessed November 5, 2018).

6

he was avoiding a fight because he did not need any additional charges filed against him. (*Id*). Plaintiff testified he was able to avoid fights by keeping quiet. (*Id.* at 72).

When Plaintiff talked to the officers, they would just respond that they would "check into it," or "see," or "get to it when they had time." (ECF No. 23-9 at 42). Plaintiff testified he was frequently told that if the officers had the time, they would move him. (*Id*). Plaintiff did not feel like the Defendants were treating his safety as a priority. (*Id*). Plaintiff testified he kept asking different deputies to be moved because he felt that one might find the time to move him. (*Id.* at 46). Plaintiff indicated it was not just the belittling that caused him concern, but he felt that Ronnie Goff would jump him. (*Id.* at 47).

Plaintiff agreed that housing could be challenging in a county jail. (ECF No. 23-9 at 42-43). However, Plaintiff felt that if an inmate said he felt threatened and was in a dangerous situation, the situation should be investigated rather than being put off. (*Id.* at 43). Plaintiff admits that he was told that he should put in a request to be placed in protective custody. (*Id*. at 43 & 46). Plaintiff testified that he was not willing to be in protective custody. (*Id*). Instead, he "just wanted to be moved to a different cellblock." (*Id.* at 43).

On September 10th, Plaintiff was pulled out of the pod because he used another inmate's kiosk number. (ECF No. 23-9 at 48). Plaintiff testified the other inmate had asked Plaintiff to "help him look up some things." (*Id)*. Plaintiff stated he was showing the inmate how to use the kiosk. (*Id*). When the inmate failed to log off, Plaintiff thought it would be funny to put on there that the inmate was scared for his safety and was suicidal. (*Id.* at 48-49). Jail personnel were going to place the inmate in a suicide smock until they realized it was the Plaintiff who entered that statement on the kiosk. (*Id.* at 49). Plaintiff was not disciplined for his conduct but was yelled at. (*Id.* at 49-50). Plaintiff told Sergeant Martinez that he had been scared for his safety and

7

security for a while and had asked numerous deputies to please move him out of the pod he was in. (*Id.* at 50). Sergeant Martinez asked Plaintiff if he was still afraid for his safety. (*Id*). Plaintiff testified he was going to answer that he was still scared but Sergeant Martinez said he was leaving and would ask Plaintiff again when he came back on shift Wednesday. (*Id*). If Plaintiff was still afraid, Sergeant Martinez said he would get Plaintiff moved. (*Id*).

On September 13th, Sergeant Martinez did ask Plaintiff if he was still afraid for his safety. (ECF No. 23-9 at 50). Plaintiff replied: "Yes, sir, I'm still kind of scared for my safety and security. You know, I just kind of keep my head down and try not to cause any attention to me." (*Id*). Sergeant Martinez did not move the Plaintiff. (*Id.* at 51). Plaintiff testified that after this he just "kind of gave up." (*Id*).

On September 15th, Plaintiff was involved in an altercation with Inmate Robert Griffin. (ECF No. 23-5 at 1). Plaintiff went to the top tier of the cell to take a shower. (ECF No. 23-9 at 55). At about the same time, Ronnie Goff was upstairs and walked by the shower. (*Id*). Plaintiff testified that Ronnie Goff kept going by the shower, so Plaintiff felt as if "something was wrong." (*Id*). When Plaintiff got out of the shower, he approached Ronnie Goff and the other inmates he was standing with and asked what was going on. (*Id*). The inmates did not say much and were very quiet. (*Id*).

Plaintiff went downstairs to his bunk and was getting changed when Inmate Dalton came down the stairs and approached Griffin. (ECF No. 23-9 at 55). The two talked in low voices and then Plaintiff heard his first name said three times. (*Id.* at 56). Plaintiff asked: "What is it, man?" (*Id*). In response, Griffin "hopped up and said, "I'm damn tired of your attitude, and I don't like it. And you need to go up to the bathroom." (*Id*). Plaintiff testified he was a "little nervous" but he stood up and went to the bathroom with the idea he could talk his way out of it. (*Id.* at 56 &

8

62). In his words, Plaintiff "went up there to try to be peaceful and everything because I couldn't understand why he had an altercation with me." (*Id.* at 61). Plaintiff testified that when he looked over at Griffin, he struck Plaintiff in the face hitting him on the nose (*Id.* at 56 & 65). The two then started fighting. (*Id*. at 65). According to Plaintiff, it took the officers "quite some while" to respond. (*Id*).

Deputy Larry McConnell was working D-pod control. (*Id*). He noticed two inmates, Plaintiff and Griffin "beginning to fight and then it went to the ground on the top tier public restroom." (*Id*). Deputy McConnell called for assistance and told all inmates to get down on the ground. (*Id*). Deputies arrived and got the situation under control. (*Id*). Both inmates were given medical attention and then rehoused in E-pod. (*Id*). The inmates were charged with intentionally creating a biohazard, contamination or attempted; assault and battery or accessory to battery or extortion/threatening or intimidating another person; disruptive conduct; refusal to obey an order, written or verbal; and interference with facility operations or staff duties. (*Id*).

The video of the incident shows[4] Plaintiff approach Griffin (3:29:24); the two begin circling each other as if getting ready to fight and both take a fighting or aggressive stance; Griffin throws the first punch (3:29:58); the two drop to the floor and their fists are flying and they are grappling with each other; Griffin gained the dominant position but then backed off, and allowed Plaintiff to stand (3:30:38); the officers arrive (3:30:49); both inmates lay on the ground on their stomachs; Plaintiff was taken down the stairs first and then to the nurses office.

Plaintiff testified he had never had problems with Griffin before the altercation occurred. (ECF No. 23-9 at 60). Griffin had never belittled the Plaintiff. (*Id*).

---

[4] Portions of the video are obscured with opaque rectangles presumably to provide privacy to inmates who are showering. This partially obscures the view of the fight.

9

Plaintiff believed Sergeant Adams was involved in some way. (ECF No. 23-9 at 84). Plaintiff testified that Sergeant Adams was on the drug task force. Prior to Plaintiff's arrest, he believed he was being followed by the task force. (*Id.* at 82-84). After the fight, Sergeant Adams, who was in E-pod, told Plaintiff he had been watching what was occurring in D-pod on the monitor. (*Id.* at 84). Plaintiff testified the deputies usually only watched the monitors for the pods they were in. (*Id*). Plaintiff had seen Ronnie Goff talking to Sergeant Adams in the hall outside the pod just prior to the events leading up to the altercation. (*Id*). Plaintiff believed he may have "messed up a case for Sergeant Adams somewhere or [did] something that offended him." (*Id*). Plaintiff believed Sergeant Adams was seeking retribution. (*Id*). Plaintiff believed Sergeant Adams was extorting other inmates to use them as muscle. (*Id*). Plaintiff did not want Sergeant Adams to put Griffin on his enemy list because if "you got people on your enemy list, and like it says right there, you look like a PC snitch." (*Id*. at 90). It would keep Plaintiff from being around Griffin but not from around "all of his other people." (*Id*).

Within an hour or hour and a half of the fight, Plaintiff was taken to the Northwest Medical Center. (ECF No. 23-9 at 66). Plaintiff was seen complaining about "pain to his right temple, left jaw, nasal bone and lip." (ECF No. 23-4. at 7). He had a nasal laceration and a laceration of his lip. *(Id)*. Plaintiff had a "fracture through the tip of the nasal bone . . . a fracture through the anterior nasal maxillary spine" . . . a deviation [of] the nasal septum, and a "fracture of the inferior aspect of the nasal septum." (*Id.* at 9). Plaintiff was prescribed Augmentin for ten days to prevent infection. (*Id.* at 12). He was to be given Motrin and Tylenol as needed for pain. (*Id*). He was to follow up with Dr. Jared Spencer at the Ear, Nose, and Throat Center of the Ozarks within one to two weeks. (*Id*).

When Plaintiff returned from the hospital, he was housed in E-pod, the lock-down pod. (ECF No. 23-9 at 68). He remained there for thirteen days, at that time Plaintiff testified they attempted to put him back in pod 109 but he begged Sergeant Kelly to put him in a different pod. (*Id*). Plaintiff was placed in pod 130. (*Id*. at 69). According to Plaintiff, Griffin bonded out a day after the fight, but Ronnie Goff remained in pod 109. (*Id*). Plaintiff had no trouble after the altercation. (*Id.* at 70).

Plaintiff was in pod 130 only a few days before he had nose surgery. (ECF No. 23-9 at 71). After the surgery, he was placed in the medical pod for about ten days. (*Id*). He was then put back into pod 130. (*Id*).

On September 21, 2017, Plaintiff pled guilty to the disciplinary violations stating that he went to the public restroom to fight Griffin. (ECF No. 23-5 at 2). Plaintiff was given fifteen days in segregation and loss of privileges. (*Id*).

According to Lieutenant Holt, Benton County inmates are "classified to the least restrictive mode of housing with due consideration to the safety of the public, inmates and staff." (ECF No. 23-1 at 2). With respect to inmates who maintain their safety is at risk in a given pod, Lieutenant Holt states that:

> Administrative Segregation/Protective Custody is used to separate from the general population inmates who cannot adjust to the general population; pose serious threat to themselves, or the security of the detention facility; or who present a valid need for protection from other inmates.
>
> If an inmate identifies a specific threat to his/her safety or security in his or her pod, the inmate will be rehoused to ensure his/her safety. However, due to the limited amount of housing options available on quick notice, such a request often results in an inmate being placed in [A]dministrative Segregation/Protective Custody until a safe housing location can be located. To assure that inmates are not moved into a dangerous situation and to guard against false claims of threats, officers must determine who poses the alleged threat claimed by an inmate before the inmates can be moved. Vague or unspecified threats do not generally lead to rehousing.

(ECF No. 23-1 at 2); *see also* (ECF No. 23-7 at 2).

According to Lieutenant Holt, "[t]here is no record that Fridline ever indicated that he was threatened by Robert Griffin at any point prior to the altercation between the two inmates." (ECF No. 23-1 at 2). In fact, Lieutenant Holt indicates that "Fridline pled guilty to a disciplinary infraction because he went to the bathroom in order to engage in a fight with Robert Griffin." (*Id*).

When asked to describe the County policy or custom that was the moving force behind the alleged violations, Plaintiff stated that if the jail were not so overcrowded, staff would not "have such trouble moving someone somewhere then it could have been avoided." (ECF No. 23-9 at 93).

**(2). Analysis of the Claim**

Prison officials have a duty, under the Eighth Amendment,[5] to protect prisoners from violence at the hands of other prisoners. *See Perkins v. Grimes,* 161 F.3d 1127, 1129 (8th Cir. 1998). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

To prevail on his failure to protect claim, Plaintiff must satisfy a two-prong test. He must demonstrate that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) prison officials were "deliberately indifferent [to his] health or safety." *See Holden v. Hirner,* 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). The first prong is an objective requirement to ensure the deprivation is a violation of a constitutional right. *Id.* The second prong, however, is subjective requiring Plaintiff show the official "both knew of and

---

[5] The record does not contain the date of Plaintiff's conviction. Regardless of whether he was a pretrial detainee during the time relevant to this claim, the Eighth Circuit applies the same Eighth Amendment analysis. *See e.g., Crow v Montgomery*, 403 F.3d 598, 600 (8th Cir. 2005).

disregarded 'an excessive risk to inmate's health or safety.'" *Id. (quoting Farmer,* 511 U.S. at 837). "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk,* 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." *Davis v. Oregon County,* 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).

Here, there is no evidence Plaintiff was incarcerated under conditions posing a substantial risk of serious harm or that the Defendants were deliberately indifferent to Plaintiff's health or safety prior to the attack. There had been no previous incidents or disputes between Plaintiff and inmate Griffin. No specific threats had been made against the Plaintiff by any inmate. Plaintiff had not indicated that any inmate would attack him. There is no evidence that Griffin was involved in other attacks.

There is no evidence that the inmates in the pod in general were prone to violence or that there had been a history of fights that put Defendants on notice that there was a substantial risk of serious harm. Plaintiff was advised that if he was concerned for his safety all he needed to do was submit a request for protective custody. Plaintiff knew he could put inmates on his enemies list and that he would then not be housed with the listed individuals. Plaintiff never identified anyone who had threatened him and made only the most general allegations. Plaintiff did not articulate facts sufficient to have placed Defendants on notice. Plaintiff did not seek help when Griffin indicated a desire to fight the Plaintiff. Rather, the Plaintiff voluntarily went to the designated location upstairs and fought with Griffin. Defendants are entitled to summary judgment on the individual capacity claims against them.

To state an official capacity claim, Plaintiff must allege that a policy or custom of Benton County was the moving force behind the deprivation of his constitutional rights. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official capacity.'" *Grayson v. Ross*, 454 F.3d 802, 811 (8th Cir. 2006) (*quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Here, Plaintiff fails to allege that a custom or policy of Benton County was the moving force behind any alleged constitutional violations. Thus, the official capacity claims against Benton County fail.

Defendants are entitled to summary judgment on the failure to protect claim.

### B. Denial of Access to the Library

**(1). Relevant Facts**

With respect to the law library, Lieutenant Holt states that the BCDC recognizes inmates have certain rights including the right to "reasonable access to the courts through counsel whether appointed or retained, and in the event, counsel has not been retained or appointed, the inmate should have reasonable access to law library materials." (ECF No. 23-1 at 3). The BCDC has a "single computer that has access to a legal research engine which is available for use by detainees." (*Id*). Because of the number of inmates and the limited resources available, requests for access to the law library are screened so that inmates who are not represented counsel are able to conduct research in the cases in which they are acting *pro se*. (*Id*). Detainees are asked if they have an attorney. (*Id*. at 3-4). If a detainee says he does not, the inmate is asked for the "type of case to try to verify that the detainee is providing accurate information." (*Id*. at 4). Inmates representing themselves are allowed "access to the computer legal research engine on a reasonable basis." (*Id*).

Lieutenant Holt oversees law library requests. (ECF No. 23-1 at 3-4). Lieutenant Holt indicates she did not "give Plaintiff access to the computer/law library because he was represented by an attorney and because he did not have a pending case in which he was his own attorney." (*Id*). After he filed a case where he represented himself, he was given access to the law library. (*Id*).

Plaintiff submitted the following requests regarding the law library:

- 9/25/2017 to 10/6/2017—I would like to go to the law library. **Response by Lieutenant Holt:** "Is this in reference to your criminal matter(s)?" **Plaintiff:** I "need to look up law matter that [refer] to my cas[e]." **Response by Lieutenant Holt:** "Is this in reference to your criminal matter(s)?" **Plaintiff:** "I need to look up legal matter that [is] between my [lawyer] and myself and my cas[e]." **Response by Lieutenant Holt:** "You may obtain this information from your attorney. Law library is intended to provide inmates access to the courts. You have access to the courts through your attorney."

- 10/6/2017—I would like to go to the law library to look up a legal matter about my case please.

- 10/9/2017—I would like to go to the law library to look up a legal matter pertaining to my case. I have been asking since 9/25/2017. **Response by Lieutenant Holt:** "Who is your attorney?" **Plaintiff:** Jay Soxton. May I use the law library to look up a legal matter.

- 10/11/2017—Still asking if I may go to the law library to look up legal matter about my case.

- 10/12/2017—May I please go to the law library to look up legal matters about my case. Thank you.

- 10/13/2017—I have been asking to use the law library to help myself with my cases. I have been asking since 9/25/2017. Lieutenant Holt has been delaying and stalling me and the information I need for my case.

- 10/15//2017—I have been asking and asking to use the law library to look up legal matters that pertain to my case. **Response by Lieutenant Holt**: "Who is your attorney?"

- 10/16/2017—May I please go to the law library to look up a legal matter pertaining to my case. **Response by Lieutenant Holt:** "Is this in reference to your criminal matter(s)? If so, who is your attorney at this time (including public defenders)?"

15

> **Plaintiff:** I need to look up a legal matter that pertains to my cases. The public defenders are over booked and state paid and spend little or no time working on a case. I have a constitutional right to represent myself in legal matters and the right to use the federal funded law library intended for inmates. **Response by Lieutenant Holt:** "Law library is intended to give inmates access to the courts. Inmates have access to the courts through their legal counsel."

- 10/17/2017—I need to look up a legal matter in the federally funded law library that is supposed to be for inmate use. **Response by Captain Guyll:** "Sir our Law Library is not Federal funded. What information do you need Sir?"

- 10/18/2017—I have been asking to use the law library to help myself with my cases for some time now. May I please use the law library? **Response to Lieutenant Holt:** "This has been explained to you. Law library is intended for those inmates without legal counsel to have access to the courts. You have access to the courts through your attorney." **Plaintiff:** My legal counsel is a public defender who is paid by the state. The state is prosecuting me. I am going to represent myself and the public defender will be my co-counsel. I need time in the law library to work on my cases, please. You are hindering my progress on my cases. **Response by Lieutenant Holt:** "You have access to the courts through your counsel."

Plaintiff submitted similar requests for access to the law library on October 22nd, 24th, 26th, and November 2nd. (ECF No. 23-3 at 7-9). On October 23, 2017, Plaintiff filed this lawsuit. On November 13th, Plaintiff submitted a request stating he had a § 1983 civil suit in which he represented himself and asked for law library access. (*Id.* at 9). His request was approved. (*Id*). Megan Rutledge advised Plaintiff that he needed to ask a pod deputy to go. (*Id*). Further, Plaintiff was advised to "keep in mind, law library is given on a schedule between all housing units." (*Id*).

Plaintiff testified he was trying to get access to the law library to educate himself on where he stood legally. (ECF No. 23-9 at 72). Plaintiff also felt he should have been allowed to research civil matters so he "knew if [he had] a case or not." (*Id.* at 74). Plaintiff conceded he was able to file his § 1983 complaint without having been to the law library. (*Id.* at page 80). Plaintiff did not have any deadlines he missed, and he did not have any cases dismissed. (*Id*). In fact, he testified this § 1983 case is his first case. (*Id*). Plaintiff believes he was harmed because he was not able

to conduct research and did not know how to word his documents. (*Id.* at 80-81). Plaintiff testified he has looked up "chapter 23," "Chapter 8 of the jailhouse indigo or jailhouse . . . something." (*Id*). After November 3rd, Plaintiff testified he did not have any issues with the law library. (*Id.* at 81). In fact, Plaintiff indicated that the "law library" had been made available on the kiosks in the pods. (*Id*).

### (2). Analysis of the Claim

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates **in the preparation and filing of meaningful legal papers** by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (emphasis added). An inmate has no standing to pursue an access claim unless he can demonstrate he suffered prejudice or actual injury because of the prison officials' conduct. *See Lewis v. Casey*, 518 U.S. 343, 351-2 (1996)*.*

Thus, "[t]o prove a violation of the right of meaningful access to the courts, a prisoner must establish [1] the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, [2] which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'" *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted). "Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996) (citation omitted).

On October 18, 201, Plaintiff informed Lieutenant Holt that he was going to represent himself in his criminal case with the public defender being co-counsel. (ECF No. 23-3 at 7). On

17

November 2, 2017, Plaintiff advised Lieutenant Holt that he needed to go to the law library to "help my self in civil and criminal matters." (*Id*. at 9). In such circumstances, the response to contact his public defender was inadequate. *See Chappell v. Helder*, 696 F. Supp. 2d 1021, 1029, 1029-30 (W.D. Ark. 2010).

Plaintiff's request to go to the law library was not approved until Plaintiff specified that he had a pending § 1983 civil suit in which he was acting *pro* se. (*Id*). The right protected by *Bounds* is to ensure inmates have meaningful access to the courts in the preparation and filing of habeas corpus petitions, post-conviction relief, and civil rights actions. Under the circumstances, Plaintiff was wrongfully denied access to the law library. However, to establish he was denied meaningful access to the courts, Plaintiff must show he suffered actual injury or prejudice as a result. *Klinger v. Department of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) (even a showing of complete and systemic denial of access to a law library or legal assistance does not establish a denial of access to the courts claim).

Here, Plaintiff admits he did not miss any deadlines with a court or have any actions dismissed because of not having library access. Instead, he argues he lacked sufficient legal knowledge in connection with his criminal case. However, he was represented by counsel in that case. He therefore had access to the courts in his criminal case. *Bounds*, 430 U.S. at 831 (legal representation is one constitutionally acceptable method to assure meaningful access to the courts).

Next, Plaintiff argues that he was unable to conduct research to determine what causes of action he should assert in this case. *See Hartsfield*, 511 F.3d at 832 (general assertions that plaintiff did not know what arguments to make were insufficient to demonstrate actual injury). Plaintiff was able to file this civil rights action. Plaintiff has shown no actual injury.

Defendants are therefore entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 21) is **GRANTED** and this case **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** this 10th day of December 2018.

/s/ P.K. Holmes, III
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE